Briar Siljander (SBN 338293)
TRIO LAW PLC
376 Beach Farm Cir. #1269
Highland, MI 48356
(248) 529-6730
briar@triolawplc.com
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

DANCE FITNESS MICHIGAN, LLC, PROPERTY MAINTENANCE, INC., DEANNA ALFREDO, 6PK MASON LLC, 6PK LIBERTY LLC, AMANDA DAVIS, TEENY TURNER LLC, NISHA MOELLER, S2 FITNESS ENTERPRISES, LLC, SAMANTHA COX, SUZANNE FISCHER, SOROS & ASSOCIATES, LLC, NICHOLE SOROS, MICHAEL SOROS, ADEDGE SERVICES INC., PAUL DUMAS, and JODI DUMAS,

Plaintiffs,

vs.

AKT FRANCHISE, LLC, AKT FRANCHISE SPV, LLC, XPONENTIAL FITNESS LLC, XPONENTIAL INTERMEDIATE HOLDINGS LLC, XPONENTIAL FITNESS, INC., XPOF ASSETCO, LLC, H&W FRANCHISE INTERMEDIATE HOLDINGS LLC, ANTHONY GEISLER, MARK GRABOWSKI, MELISSA CHORDOCK, ELIZABETH “LIZ” BATTERTON COOPER, ALEXANDER CORDOVA, LANCE FREEMAN, RYAN JUNK, MEGAN MOEN, JOHN MELOUN, SARAH LUNA, TORI JOHNSTON, JUSTIN LACAVA, BOBBY TETSCH, JONATHAN TYLICKI, BRANDON WILES, JASON LOSCO, BRITTNEY HOLOBINKO, AMY WEHRKAMP, CAM FERGUSON, WAYNE THOMPSON, RYAN MCADAMS, PATRICK BONNER, SCOTT SVILICH, SARAH NOLAN, EMILY BROWN, RACHEL MARKOVIC, and DOES 1 through 10, inclusive,

Defendants.

**Case No: 8:23-cv-01643 JVS(JDEx)**

Honorable James V. Selna

Orange County Superior Court Case No. 30-2023-01345433-CU-AT-CXC

**AMENDED COMPLAINT**

Plaintiffs, DANCE FITNESS MICHIGAN, LLC, a Michigan limited liability company, PROPERTY MAINTENANCE, INC., a Michigan corporation, DEANNA ALFREDO ("Deanna"), AMANDA DAVIS ("Amanda"), 6PK MASON LLC, an Ohio limited liability company, 6PK LIBERTY LLC, an Ohio limited liability company, NISHA MOELLER ("Nisha"), TEENY TURNER LLC, an Illinois limited liability company, SAMANTHA COX ("Samantha"), SUZANNE FISCHER ("Suzie"), S2 FITNESS ENTERPRISES, LLC, a Georgia limited liability company, NICHOLE SOROS ("Nichole"), MICHAEL SOROS ("Michael"), SOROS & ASSOCIATES, LLC, a Florida limited liability company, PAUL DUMAS ("Paul"), JODI DUMAS ("Jodi"), and ADEDGE SERVICES INC., a Florida corporation (collectively, "Plaintiffs") by and through its counsel, Trio Law PLC, hereby file this Complaint against Defendants, AKT FRANCHISE, LLC ("AKT Franchisor"), AKT FRANCHISE SPV, LLC ("AKT Franchisor SPV"), XPONENTIAL FITNESS LLC ("Xponential"), XPONENTIAL INTERMEDIATE HOLDINGS LLC ("Xpo Holdings"), XPONENTIAL FITNESS, INC. ("Xpo Inc.," and collectively with AKT Franchisor, AKT Franchisor SPV, Xponential, Xpo Holdings, and Xpo Inc., the "Corporate Defendants"), ANTHONY GEISLER ("Geisler"), ELIZABETH "LIZ" BATTERTON COOPER ("Cooper"), MELISSA CHORDOCK ("Chordock"), ALEXANDER CORDOVA ("Cordova"), LANCE FREEMAN ("Freeman"),

MARK GRABOWSKI ("Grabowski"), RYAN JUNK ("Junk"), MEGAN MOEN ("Moen"), JOHN MELOUN ("Meloun"), SARAH LUNA ("Luna"), TORI JOHNSTON ("Johnston"), JUSTIN LACAVA ("LaCava"), BOBBY TETSCH ("Tetsch"), JONATHAN TYLICKI ("Tylicki"), BRANDON WILES ("Wiles"), JASON LOSCO ("Losco"), BRITTNEY HOLOBINKO ("Holobinko"), AMY WEHRKAMP ("Wehrkamp"), CAM FERGUSON ("Ferguson"), WAYNE THOMPSON ("Thompson"), RYAN MCADAMS ("McAdams"), PATRICK BONNER ("Bonner"), SCOTT SVILICH ("Svilich") SARAH NOLAN ("Nolan"), EMILY BROWN ("Brown"), and RACHEL MARKOVIC ("Markovic" and collectively with Geisler, Cooper, Chordock, Cordova, Freeman, Grabowski, Junk, Moen, Meloun, Luna, Johnston, LaCava, Tetsch, Tylicki, Wiles, Losco, Holobinko, Wehrkamp, Ferguson, Thompson, McAdams, Bonner, Svilich, Nolan, and Brown, the "Individual Defendants"), alleging as follows:

## **NATURE OF THIS ACTION**

1. Plaintiffs are six former franchisees of the AKT fitness brand, all of whom were forced to close their franchised studios after spending between $800,000 and more than $2 million developing franchised studios as a direct result of material misrepresentations made by their franchisor, AKT Franchisor, and its directors, officers, employees, and agents. Plaintiffs bought into the Xponential façade and were financially annihilated by the reality behind the façade.

2. From the beginning, AKT leadership (as well as the leadership of its ultimate parent, Xponential, Inc.) repeated false representations that Plaintiffs would have 300 studio members by their grand opening and told Plaintiffs the membership rates Plaintiffs would charge their members, effectively providing the monthly gross revenues that Plaintiffs would earn at their studios. All of this was done at and prior to each Plaintiff's discovery day and was intended to induce Plaintiffs to sign franchise agreements and area development agreements with AKT Franchisor. The numbers were never achieved by Plaintiffs and, upon information and belief, were not achieved, and certainly not maintained, by any other AKT studio, whether franchisee- or corporate-run.

3. Similarly, AKT Franchisor and several Defendants grossly misrepresented (in their FDD and elsewhere) the cost that Franchisees would expend to open their studios, in almost every case by hundreds of thousands of dollars. Defendants also misrepresented the time it would take to open the studios, representing they would be open and generating the represented revenues within twelve weeks of the signing of franchise agreements. In reality, the time to open was twelve months or more.

4. As AKT Franchisor began franchising in late 2018, AKT Franchisor, Geisler, Grabowski, and Xponential were in active disputes with Anna Kaiser, the face and namesake of the AKT franchise. Defendants concealed from Plaintiffs their disputes with Anna Kaiser, touting her celebrity involvement in the brand even

while Anna Kaiser alleged that AKT Franchisor and Xponential ceased paying Anna Kaiser as required under their contracts with her. Without Anna Kaiser's involvement, the franchise system had no brand recognition.

5. Plaintiffs, having been promised a turnkey business with experienced leadership, all soon discovered there was no system and Xponential's leadership had no answers to Plaintiffs' inability to achieve the member numbers that they were told they would achieve and, in turn, the gross revenue they expected. These problems were not unique to Plaintiffs, but existed across the brand. Of 30 original franchisees in 2018 and 2019, it appears at best 7 remain in the AKT system. Plaintiffs were not anomalies either. Indeed, Plaintiffs were regularly promoted to other franchisees as the operators to emulate. For example, Detroit Franchisees were named Franchisee of the Year three times.

6. Yet, despite following AKT Franchisor's directions precisely and trying every strategy and approach to make their AKT studios succeed, Plaintiffs continued to lose thousands and tens of thousands of dollars each month, finally requiring them to close their studios.

7. When Plaintiffs closed their respective AKT studios (after, in each case, offering AKT Franchisor to take over the studio), AKT Franchisor and Xponential filed suit against all of Plaintiffs (except East Florida Franchisee and its operators, Paul and Jodi) in arbitration to send a message to them and make an example to other franchisees. Those arbitrations remain pending now and Plaintiffs in this

lawsuit challenge the enforceability of the arbitration provisions, also seeking redress for the multitude of misrepresentations made by Defendants.

## THE PARTIES

8. Plaintiff Property Maintenance, Inc. ("Royal Oak Franchisee") is a Michigan corporation with its principal place of business in Bloomfield Hills, Michigan.
9. Plaintiff Dance Fitness Michigan, LLC ("Rochester Hills Franchisee"; together with Royal Oak Franchisee, "Detroit Franchisees") is a Michigan limited liability company with its principal place of business in Rochester Hills, Michigan.
10. Plaintiff Deanna is domiciled in Michigan.
11. Plaintiff 6PK Mason LLC ("Mason Franchisee") is an Ohio limited liability company with its principal place of business in Mason, Ohio.
12. Plaintiff 6PK Liberty LLC ("Liberty Franchisee"; together with Mason Franchisee, "Ohio Franchisees") is an Ohio limited liability company with its principal place of business in Liberty Township, Ohio.
13. Plaintiff Teeny Turnery LLC ("Chicago Franchisee") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.
14. Plaintiff Nisha is domiciled in Illinois.
15. Plaintiff S2 Fitness Enterprises, LLC ("Inman Park Franchisee") is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.
16. Plaintiff Samantha is domiciled in Georgia.

17. Plaintiff Suzie is domiciled in Georgia.

18. Plaintiff Soros & Associates ("Tampa Franchisee") is a Florida limited liability company with its principal place of business in Tampa, Florida.

19. Plaintiff Nichole is domiciled in Florida.

20. Plaintiff Michael is domiciled in Florida.

21. Plaintiff AdEdge Services Inc. ("East Florida Franchisee;" together with Detroit Franchisee, Mason Franchisee, Liberty Franchisee, Chicago Franchisee, Inman Park Franchisee, and Tampa Franchisee, "Franchisees") is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.

22. Plaintiff Paul is domiciled in Florida.

23. Plaintiff Jodi is domiciled in Florida.

24. Defendant XPONENTIAL FITNESS, INC. ("Xpo Inc."), is a publicly traded Delaware corporation with its principal place of business at 17877 Von Karman Ave., Suite 100, Irvine, Orange County, California ("Xponential Corporate Office").

25. Upon information and belief, Defendant XPONENTIAL INTERMEDIATE HOLDINGS LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

26. Upon information and belief, Defendant XPONENTIAL FITNESS LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

27. Upon information and belief, Defendant XPOF ASSETCO, LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

28. Defendant AKT FRANCHISE, LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

29. Defendant AKT FRANCHISE SPV, LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

30. Upon information and belief, Defendant XPONENTIAL INTERMEDIATE HOLDINGS LLC, is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

31. Upon information and belief, Defendant XPONENTIAL INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.

32. Defendant Geisler is domiciled in orange County, California, and conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office in Orange County, California.

33. Upon information and belief, Defendant Cooper conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

34. Upon information and belief, Defendant Chordock conducts business at the Xponential Corporate Office.

35. Upon information and belief, Defendant Cordova is domiciled in Orange County, California, and conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

36. Upon information and belief, Defendant Freeman is in Orange County, California, conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

37. Upon information and belief, Defendant Grabowski conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

38. Upon information and belief, Defendant Junk conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

39. Upon information and belief, Defendant Moen conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

40. Upon information and belief, Defendant Meloun conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

41. Upon information and belief, Defendant Luna conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

42. Upon information and belief, Defendant Johnston is domiciled in Orange County, California, and conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

43. Upon information and belief, Defendant LaCava conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

44. Upon information and belief, Defendant Tetsch is domiciled in Orange County, California.

45. Upon information and belief, Defendant Tylicki is domiciled and conducts business in Orange County, California, and conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

46. Upon information and belief, Defendant Wiles is domiciled in Orange County, California.

47. Upon information and belief, Defendant Losco conducts business in Orange County, California, and conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

48. Upon information and belief, Defendant Holobinko conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

49. Upon information and belief, Defendant Wehrkamp conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

50. Upon information and belief, Defendant Ferguson conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

51. Upon information and belief, Defendant Thompson conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

52. Upon information and belief, Defendant McAdams conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

53. Upon information and belief, Defendant Bonner conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

54. Upon information and belief, Defendant Svilich conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

55. Upon information and belief, Defendant Nolan conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

56. Upon information and belief, Defendant Brown conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

57. Upon information and belief, Defendant Markovic conducts or conducted business relating to the allegations in this complaint at the Xponential Corporate Office.

58. Upon information and belief, all Individual Defendants are currently, or were during the events described in this Complaint, employees of one or more of the Corporate Defendants.

59. The fictitious Defendants, DOES 1 through 10, inclusive, are sued pursuant to

California Civil Procedure Code section 474. Plaintiffs are ignorant of the true names and capacities, whether individual, corporate, or otherwise, of such fictitious Defendants. Upon information and belief, each such fictitious Defendant was in some way responsible for, participated in, and/or contributed to the misconduct alleged against Plaintiffs as set forth herein. When Plaintiffs ascertains the true names of such fictitious Defendants and their respective responsibility, for participation in and contribution to the misconduct alleged herein, Plaintiffs will seek leave to amend this complaint to designate same.

## JURISDICTION AND VENUE

60. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

61. The amount in controversy exceeds $25,000 and this matter is within the jurisdiction of the Court.

62. Each of the Defendants is subject to personal jurisdiction in California because each is domiciled there and/or each purposefully established contacts with California in their employment and agency with Xponential and AKT Franchisor and Plaintiffs' actions arise out of and relate to Defendants' contacts with California.

63. Venue is proper in this Court because several Defendants, including Xponential, AKT Franchisor, and Geisler reside in Orange County, California.

## FACTUAL ALLEGATIONS

***Structure of Defendants' Entities***

64. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

65. Xpo Inc. purports to be "the largest global franchise group of boutique fitness brands."

66. Xpo Inc. is the ultimate parent company of ten franchised fitness brands, including AKT, Pure Barre, Yoga Six, Row House, Stride, Rumble, Stretch Lab, CycleBar, Club Pilates, and BFT (Body Fit Training).

67. Xpo Inc. is traded publicly on the New York Stock Exchange.

68. Xpo Holdings and Xponential are subsidiaries of Xpo Inc., and are intermediate entities between Xpo Inc. and the franchising entity defendants, AKT Franchisor and AKT Franchisor SPV.

69. In March 2023, Xpo Inc. initiated an internal restructuring, creating new entities through which it franchised its ten brands, and transferring the trademarks and intellectual property of the old franchising entities to new special purpose vehicles.

70. In the case of AKT, Xpo Inc. ceased selling franchises through AKT Franchisor and began selling AKT franchises through AKT Franchisor SPV.

71. In the restructuring, Xpo Inc. created a new direct parent company to AKT SPV

Franchisor – XPOF Assetco – which purports to guarantee the obligations of AKT Franchisor SPV, and which means AKT Franchisor SPV is no longer required to disclose its financial statements in its franchise disclosure document.

72. The franchise agreements and area development agreements between AKT Franchisor and the respective Plaintiffs remain between the respective Plaintiffs and AKT Franchisor.

***The AKT Brand and Anna Kaiser's Purported Involvement***

73. Anna Kaiser, a celebrity fitness trainer based in New York City, New York, created the "Anna Kaiser Technique," called "AKT" for short – a dance fitness concept with sessions and classes choreographed by Anna Kaiser.

74. AKT Franchisor acquired the AKT brand and concept from Anna Kaiser on approximately March 22, 2018.

75. As part of the transaction, AKT Franchisor entered into a consulting agreement with Anna Kaiser under which AKT Franchisor agreed to pay Anna Kaiser $250,000 per year.

76. Not long after, AKT Franchisor began to offer and sell AKT franchises.

77. From the beginning, AKT Franchisor and its representatives promoted Anna Kaiser as the face of the AKT brand, touting her celebrity connections with the likes of Shakira and Kelly Ripa.

78. AKT Franchisor and its representatives made broad claims about Anna Kaiser's involvement in the franchise, stating she was involved in leadership and strategic decision-making and that she would be creating and choreographing all the content Plaintiffs would use in classes at their franchise studios.

79. AKT Franchisor and its representatives represented to many of Plaintiffs that Anna Kaiser would attend their grand opening and otherwise participate in pop-up classes and other marketing initiatives.

80. Indeed, Anna Kaiser, AKT Franchisor represented, would operate three studios as an AKT franchisee, and so would be involved both on the corporate franchisor side and on the franchisee side.

81. In short Anna Kaiser was the AKT brand and Plaintiffs were sold on AKT because of the involvement that AKT Franchisor represented Anna Kaiser had and would continue to have in the franchise system.

***Representations Regarding Initial Members, Rates, Revenues and Opening***

82. AKT Franchisor made several representations to Plaintiffs at and prior to discovery day (prior to the time Plaintiffs signed their respective franchise agreements and area development agreements).

83. At and prior to the respective discovery days attended by Plaintiffs, AKT Franchisor told Plaintiffs that they would expect 100 members at their studio

prior to opening a studio (referred to by AKT Franchisor as "pre-opening"), 200 members during "soft opening" (the period between opening of the studio and the grand opening event), and 300 members by their grand opening event, with additional continuing growth thereafter.

84. Also prior to and at discovery day, AKT Franchisor told Plaintiffs the amount they would be charging members for monthly memberships, and provided it to Plaintiffs in a pro forma.

85. AKT Franchisor represented to Plaintiffs that their studios would be open and operating four to eight weeks after executing a lease, with grand opening occurring within twelve weeks of executing a lease. AKT Franchisor said this was because of its experienced team and turn-key system.

86. By multiplying the number of members AKT Franchisor represented they would have by the monthly fee AKT Franchisor said they would charge their members, Plaintiffs were easily able to develop gross revenue projections for their anticipated studios.

***Representations Regarding Initial Investment and Costs***

87. In its franchise disclosure documents in 2018, 2019, and 2020, AKT Franchisor made a representation regarding the range of Plaintiffs' estimated initial investment to begin operating an AKT franchise studio. For 2018, the range was

$346,100 to $487,000; for 2019, the range was $356,600 to $497,500; and for 2020, the range was $320,616 to $495,516.

88. AKT Franchisor represented that it estimated 70-95% of these startup costs would be from "Approved Suppliers and purchases that must meet our specifications."

89. AKT Franchisor's representatives affirmed these representations during and prior to discovery day and qualified that the higher end of the range was not applicable to Plaintiffs' studios based on their markets and locations.

***Franchise Agreements and Area Development Agreements at Issue***

90. AKT Franchisor entered into the following franchise agreements (collectively, "Franchise Agreements" and each a "Franchise Agreement") and area development agreements (collectively, "Area Development Agreements" and each an "Area Development Agreement"; Area Development Agreements together with Franchise Agreements, "Agreements") with the respective Plaintiffs:

a. Area Development Agreement with Royal Oak Franchisee dated September 12, 2018.

b. Franchise Agreement with Royal Oak Franchisee dated September 12, 2018.

c. Franchise Agreement with Rochester Hills Franchisee dated June 26, 2019.

d. Area Development Agreement with Amanda dated June 7, 2019.

e. Franchise Agreement with Liberty Franchisee dated June 7, 2019.

f. Franchise Agreement with Mason Franchisee dated approximately January 2020

g. Franchise Agreement with Chicago Franchisee dated February 4, 2020.

h. Area Development Agreement with Inman Park Franchisee dated June 4, 2019.

i. Franchise Agreement with Inman Park Franchisee dated March 21, 2019.

j. Area Development Agreement with Tampa Franchisee dated February 24, 2021.

k. Franchise Agreement with Tampa Franchisee dated February 27, 2021.

l. Area Development Agreement with East Florida Franchisee dated June 12, 2020.

m. Franchise Agreement with East Florida Franchisee dated June 9, 2020.

n. Franchise Agreement with East Florida Franchisee dated December

31, 2020.

o. Franchise Agreement with East Florida Franchisee dated September 30, 2021.

***Leases and Buildout of Studios***

91. After execution of their respective Agreements with AKT Franchisor, Plaintiffs began in earnest to prepare to open their respective franchise studios.

92. Plaintiffs learned that the AKT franchise system was not the "turn-key" system advertised by Geisler, Chordock, and other AKT personnel.

93. AKT Franchisor required Plaintiffs to use a lawyer specified by AKT Franchisor to negotiate their lease.

94. AKT Franchisor's real estate personnel took longer than represented to find locations AKT Franchisor stated were suitable for the studios.

95. When leases were finally executed, Plaintiffs began the buildout of their studios. Plaintiffs soon discovered the studio buildout process was mired by incompetence and delay of AKT Franchisor personnel and third party suppliers and vendors AKT Franchisor required Plaintiffs to use.

96. During the buildout time, Plaintiffs had already begun to expend funds, hiring staff and advertising as directed by AKT Franchisor.

97. Contrary to AKT's representations that Plaintiffs would be operating their

studios four to eight weeks after signing their Franchise Agreements and that their grand opening would occur within twelve weeks of signing their Franchise Agreements, it was approximately twelve months before Plaintiffs' studios reached grand opening.

98. Anthony Geisler ultimately admitted that the AKT team was inadequate, stating he hired whom he could get because AKT was a startup and "start ups do not attract talent."

***Separation From Anna Kaiser and Ensuing Litigation***

99. Almost from the outset, Geisler, Grabowski, Xponential, and AKT Franchisor began feuding with Anna Kaiser and ultimately ceased paying her as required under her consulting agreement.

100. Having actively promoted Anna Kaiser, by which means Defendants convinced Plaintiffs to execute the Agreements, Geisler, Grabowski, Xponential, and AKT Franchisor engaged in scorched-earth conflict of egos litigation against Anna Kaiser to the detriment of the AKT franchise system.

101. All the while, Defendants pretended all was well with Anna Kaiser and did not disclose the disputes and lawsuits, nor the fact that, because they had ceased paying Anna Kaiser under her consulting agreement, she was no longer providing content for franchisee classes and was instead beginning to operate

her own Anna Kaiser Studios brand.

102. While Plaintiffs struggled to launch their studios with minimal support from AKT Franchisor and Xponential, Xponential spent well over three million dollars in legal fees litigating against Anna Kaiser, money that could have been better spent easing the impact of under-stated buildout costs and reducing the percentage markup on required purchases by franchisees.

***Operation of Studios***

103. Plaintiffs were required to follow the operational and marketing directives of AKT Franchisor.

104. Following AKT Franchisor's methods, Plaintiffs could not achieve, let alone sustain, the membership numbers represented by AKT Franchisor.

105. Membership attrition outpaced new member signups and Plaintiffs soon found themselves operating studios that were losing thousands of dollars per month and, in some cases, more than $25,000 per month.

106. Leadership at AKT Franchisor and Xponential had no solutions to the problems with the franchise system raised by Plaintiffs, with AKT Franchisor's President, Chordock, often simply ignoring the issues raised and requests for help from Plaintiffs.

107. Instead, Xponential announced two new programs: 1) XPass – a program

which competed with Plaintiffs' studios for members by providing the same members the ability to purchase from Xponential directly a similarly-priced membership that allowed them to attend classes at all Xponential brand studios, including Plaintiffs' studios; and 2) AKT Go (later named XPlus) – an online option offering the same content and classes available in Plaintiffs' studios through an online, on-demand application.

108. When XPass members attended Plaintiffs' studios, they received minimal compensation, often just a few dollars per member per class, a far cry from the membership tier amounts represented to Plaintiffs to induce them to become franchisees.

109. As XPass was promoted by Xponential, Plaintiffs began to have even more difficulty coaxing prospects to become members of their studios when they weighed the alternative of still having Plaintiffs' studio classes available to them (because Xponential and AKT Franchisor required participation by Plaintiffs in XPass), but being able to access the other Xponential modalities for a similar monthly cost.

***Closure of Studios***

110. After months of operating their studios at significant losses (with most Plaintiffs working full time without drawing compensation) and having

exhausted cash reserves, Plaintiffs were forced to close.

111. In each case, Plaintiffs tried to determine whether AKT Franchisor would repurchase their studios or at least take them over prior to their closure.

112. AKT Franchisor did not do so, waiting until after the studios closed to swoop in and attempt to reopen the studios and make it appear to the public as if there was no closure.

113. In many instances, AKT Franchisor demanded Plaintiffs pay AKT Franchisor to take over their studios (into which Plaintiffs had invested hundreds of thousands of dollars), with the threat of suing Plaintiffs if they refused.

114. In the end, each of Plaintiffs' AKT studios closed as follows:

a. Inman Park Franchisee closed its studio on May 30, 2022.

b. East Florida Franchisee closed its first studio October 16, 2022.

c. East Florida Franchisee closed its second studio on November 13, 2022.

d. East Florida Franchisee closed its third studio on November 13, 2022.

e. Royal Oak Franchisee closed its studio on December 31, 2022.

f. Rochester Hills Franchisee closed its studio on December 31, 2022.

g. Mason Franchisee closed its studio on March 4, 2023.

h. Liberty Franchisee closed its studio on March 4, 2023.

i. Chicago Franchisee closed its studio on March 19, 2023.

j. Tampa Franchisee closed its studio on March 20, 2023.

***Arbitration Actions Filed by AKT Franchisor***

115. Without prior notice to Plaintiffs, on the evening of March 22, 2023, AKT Franchisor and Xponential filed demands for arbitration against Nisha, Samantha, Suzie, Inman Park Franchisee, Michael, Nichole, and Amanda.

116. On April 27, 2023, AKT Franchisor and Xponential subsequently filed an additional demand for arbitration against Deanna and Detroit Franchisee.

***Firing of AKT's President and Beginning of Acknowledgment***

117. Throughout the entire process, Defendants insisted to each Plaintiff, individually, that the Plaintiff was the problem, at the same time being unable to point to deficiencies in Plaintiffs' operations that could explain the poor studio performance.

118. Finally, approximately on February 27, 2023, AKT Franchisor made what appeared to be its first acknowledgement that the problem was the system, and not its franchisees, when it announced that Chordock had been removed as President of AKT Franchisor.

119. While Chordock appears to have remained with AKT Franchisor for a time following her removal as President, she has since been fully discharged from

duties.

120. In subsequent meetings with franchisees, AKT Franchisor first admitted to its franchisees that virtually every AKT studio was losing money. AKT Franchisor promised to somehow make changes necessary to save the brand. Unfortunately, this talk was all too little too late for Plaintiffs.

***The Façade Maintained by Defendants***

121. In the midst of the collapse of its franchise system, AKT Franchisor has maintained the same façade it constructed at the outset, Its Chief Executive Officer, Geisler, engaged in the following exchange on national television (on Jim Kramer's *Mad Money* show on CNBC) on May 11, 2023:

> Geisler: We've actually never had a closure [of a franchisee studio]."
>
> Kramer: "Have you ever had to terminate anybody?"
>
> Geisler: "Uh, no, we, I mean, we'll, we'll terminate people that haven't gotten open in time, right, uh, but as far as people that are open, they typically will just transfer to somebody else. They may be in the business for a couple of years and they typically sell at three and a half to four times EBITDA."

122. The same misrepresentations about AKT Franchisor, Xponential, and Geisler that convinced Plaintiffs to become franchisees in the AKT franchise system are easy to identify because many continue to today.

123. Despite having filed arbitration demands against Plaintiffs and having terminated Plaintiffs' Franchise Agreements at least two months prior, Geisler

stunningly represented to the world that Xponential (not just AKT) had "actually never had a closure" of a franchise studio.

***Roles of the Individual Defendants***

124. Defendant Geisler was Chief Executive Officer of AKT and President of Xponential, the parent company of AKT, during the events at issue in this lawsuit.

125. Defendant Chordock was the President of AKT during the events at issue in this lawsuit.

126. Defendant LaCava is the Director of Franchise Development of Xponential and was Senior Brand Manager at St. Gregory Development Group, LLC, during the events at issue in this lawsuit.

127. Defendant Freeman is the President of Franchise Development of Xponential and was the President of Franchise Development at St. Gregory Development Group, LLC, during the events at issue in this lawsuit.

128. Defendant Johnston was the Chief Marketing Officer of AKT during the events at issue in this lawsuit.

129. Defendant Tetsch was the Director of Sales of AKT during the events at issue in this lawsuit.

130. Defendant Wiles was the Director of Finance of AKT during the events at issue in this lawsuit.

131. Defendant Tylicki was the Director of Education of AKT during the events at issue in this lawsuit.

132. Defendant Losco was the Vice President of Franchise Development of Xponential and AKT during the events at issue in this lawsuit.

133. Defendant Cooper was the Director of Development for AKT during the events at issue in this lawsuit.

134. Defendant Cordova was the Corporate Controller of AKT during the events at issue in this lawsuit.

135. Defendant Grabowksi was the Director of Xponential Inc. and Manager of AKT during the events at issue in this lawsuit.

136. Defendant Junk was the Chief Operating Officer of Xponential and AKT during the events at issue in this lawsuit.

137. Defendant Moen was the Executive Vice President of Finance for Xponential, AKT, Club Pilates Franchise, LLC, Cyclebar Franchising, LLC, PB Franchising, LLC, Row House Franchise, LLC, Rumble Franchise, LLC, Stretch Lab Franchise, LLC, and Yoga Six Franchise, LLC during the events at issue in this lawsuit.

138. Defendant Meloun was the Chief Financial Officer for Xponential and AKT during the events at issue in this lawsuit.

139. Defendant Luna was the President of Xponential, Club Pilates Franchise, LLC, CycleBar Franchising, LLC, Pure Barre Franchising, Row House Franchise, LLC, Rumble Franchise, LLC, Stretch Lab Franchise, LLC, Stride Franchise, LLC, and Yoga Six Franchise, LLC during the events at issue in this lawsuit.

140. Defendant Johnston was the Chief Marketing Officer of AKT during the events at issue in this lawsuit.

141. Defendant Holobinko made representations of AKT and management of sales and/or directly involved during the events at issue in this lawsuit.

142. Defendant Wehrkamp made representations of AKT and management of sales and/or directly involved during the events at issue in this lawsuit.

143. Defendant Ferguson was the Director of Franchise Sales of AKT during the events at issue in this lawsuit.

144. Defendant Thompson was the Director of Real Estate of AKT during the events at issue in this lawsuit.

145. Defendant McAdams was the Development Director of AKT during the events at issue in this lawsuit.

146. Defendant Bonner was the Director of Real Estate of AKT during the events at issue in this lawsuit.

147. Defendant Svilich was the Vice President of Operations of AKT during the events at issue in this lawsuit.

148. Defendant Nolan was the Operations Manager of Xponential and Operations Manager of St. Gregory Development Group, LLC during the events at issue in this lawsuit.

149. Defendant Brown was the Vice President of Franchise Development of Xponential during the events at issue in this lawsuit.

150. Defendant Markovic was the Manager of Franchise Development Relations of Xpo Inc. and Sales Coordinator of St. Gregory Development Group, LLC during the events at issue in this lawsuit.

**FIRST CAUSE OF ACTION**

**DECLARATORY JUDGMENT – UNENFORCEABILITY OF ARBITRATION PROVISIONS**

***(Plaintiffs Against Defendants)***

151. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

152. There is an actual, substantial, justiciable, and continuing controversy between Plaintiffs and Defendants concerning each party's rights and

obligations under the Agreements and, specifically, with respect to the parties' rights and obligations under the arbitration provisions contained in the Agreements ("Arbitration Provisions").

153. Defendant, AKT Franchisor, has filed a Demand for Arbitration against Deanna and Detroit Franchisee (Case No. 01-23-0001-9565); Nisha (Case No. 01-23-0001-2023); Samantha, Suzie, Inman Park Franchisee (Case No. 01-23-0001-2030); Michael, Nichole (Case No. 01-23-0001-2033); and Amanda (Case No. 01-23-0001-2034); (collectively, the "Arbitration Proceedings").

154. Plaintiffs' legal rights and obligations under the Arbitration Provisions are uncertain; Plaintiffs believe that the Arbitration Provisions are unenforceable.

155. The Arbitration Provisions are both procedurally and substantively unconscionable in at least 15 ways:

a. The Arbitration Provisions require Franchisees, but not AKT Franchisor, to keep arbitration proceedings and filings confidential.

b. The Arbitration Provisions purport to waive Franchisees' rights to punitive, exemplary, incidental, indirect, special, and consequential damages, but not such rights of AKT Franchisor, instead expressly permitting AKT Franchisor to recover expectation and consequential damages.

c. The Arbitration Provisions permit AKT Franchisor, but not Franchisees, to seek injunctive relief in court for a multitude of claims,

and purport to waive Franchisees' rights to any remedies or damages for wrongfully-instated injunctions.

d. The Arbitration Provisions prohibit Franchisees from filing or joining a class action, or from consolidating any proceedings with other franchisees or any other third party despite near-identical claims, requiring independent arbitration that is likely to cost more than $100,000 in arbitration/arbitrator fees for each franchisee.

e. The Arbitration Provisions require Franchisees, at AKT Franchisor's option, to participate in pre-arbitration mediation through the American Arbitration Association without a similar requirement for AKT Franchisor, and provide a 30-day waiting period for AKT Franchisor to merely decide whether it will require Franchisees to mediate claims raised by Franchisees.

f. The Arbitration Provisions require mediation and arbitration at AKT Franchisor's headquarters.

g. The Arbitration Provisions require Franchisees, but not AKT Franchisor, to send a written notice describing in detail claims against AKT Franchisor; AKT Franchisor has no similar obligation.

h. The Arbitration Provisions require Franchisees, but not AKT Franchisor, to receive a written declaration from AKT Franchisor or a mediator that further mediation proceedings are not worthwhile before

Franchisees may proceed with its claims; AKT Franchisor has no such obligation.

i. Some of the Arbitration Provisions purport to waive Franchisees' claims if not raised by Franchisees within thirty (30) days.

j. The Arbitration Provisions purport to limit Franchisees' time to bring an action against AKT Franchisor to one year, but provides no such limitation against AKT Franchisor.

k. The Arbitration Provisions purport to waive Franchisees' rights to any remedy for "fraud, misrepresentation, or deceit by [AKT] Franchisor, including without limitation, rescission of this Agreement," with no similar restriction applicable to AKT Franchisor.

l. The Arbitration Provisions purport to prohibit claims by Franchisees against any party other than AKT Franchisor.

m. The Arbitration Provisions purport to waive Franchisees' claims relating to reliance on representations by AKT Franchisor and its personnel.

n. The Arbitration provisions are in the same font as the rest of the roughly 40-page Agreements and contained no special designation.

o. The Arbitration Provisions, and indeed the Agreements altogether, were non-negotiable take-it-or-leave-it propositions, all drafted by AKT Franchisor.

156. The Arbitration Provisions do not contain a "modicum of bilaterality"; rather, they are wholly one-sided in favor of their drafter, AKT Franchisor.

157. The Arbitration Provisions contain several terms directly in conflict with the California Franchise Investment Law (Cal Corp. Code 31000 *et seq.* ("CFIL").

158. Without relief from the Court resolving the dispute over the enforceability of the Arbitration Provisions, Plaintiffs will be faced with uncertainty and insecurity with respect to how they may proceed without waiving or limiting their rights by participating in arbitration when the Arbitration Provisions are not enforceable.

159. Plaintiffs, already having lost hundreds of thousands of dollars (and in some cases with losses in the millions), would be required to pay arbitration and arbitrator fees expected to be more than $100,000 each, when they may not in fact be required to arbitrate their claims as a result of the procedural and substantive unconscionability of the Arbitration Provisions.

160. Pursuant to California Code of Civil Procedure § 1060, Plaintiffs seek a declaration from this Court stating that the Arbitration Provisions are void and unenforceable, and the Arbitration Proceedings filed against Plaintiffs may not be pursued by Defendants.

161. Plaintiffs further seek an order from this Court enjoining Defendants from pursuing claims in arbitration against them.

## SECOND CAUSE OF ACTION

## VIOLATION OF CALIFORNIA FRANCHISE INVESTMENT LAW § 31200: FAILURE TO DISCLOSE DIRECTORS, PRINCIPAL OFFICERS, AND INDIVIDUALS WITH MANAGEMENT RESPONSIBILITY

***(Plaintiffs Against Defendants)***

162. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

163. Section 31114 of the California Franchise Investment Law ("CFIL") requires that each "application for registration shall be accompanied by a proposed franchise disclosure document, which shall contain the material information set forth in the application for registration, as specified by rule of the commissioner, and such additional disclosures as the commissioner may require."

164. California Rule 310.111 requires applications for registration to offer and sell franchises in California to submit a Uniform Franchise Registration Application containing all information required by the NASAA Uniform Franchise Disclosure Document Guidelines effective July 1, 2007.

165. Section 31200 of the CFIL states:

> It is unlawful for any person willfully to make any untrue statement of a material fact in any application, notice or report filed with the commissioner under this law, or willfully to omit to state in any such application, notice, or report any material fact which is required to be stated therein, or fail to notify the commissioner of any material change as required by Section 31123.

166. The FTC Franchise Rule requires AKT to disclose in Item 2 of its FDD "by name and position the franchisor's directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises," and, for each person, his or her principal positions and employers during the past five years, including each position's starting date, ending date, and location.

167. At the time of issuance of AKT Franchisor's 2018 FDD, 2019 FDD, and 2020 FDD, Geisler was (and, upon information and belief, remains) the Chief Executive Officer of AKT and a member of the board of managers of AKT. Geisler has confirmed in several declarations, under penalty of perjury, that he is the Chief Executive Officer of AKT.

168. Geisler had at all relevant times management responsibility relating to the sale and operation of franchises.

169. Based on his title and role in AKT, Geisler is required to be listed in Item 2 of AKT's FDD.

170. Geisler was originally listed as the Chief Executive Officer of AKT in the 2018 FDD; however, for unstated reasons, AKT Franchisor removed Geisler from the 2019 FDD, 2020 FDD, and all subsequent FDDs.

171. Grabowski is also a member of the board of managers of AKT.

172. Geisler and Grabowski are and, at least as of late 2020, were, very involved in the management of AKT.

173. Geisler declared on September 28, 2020:

> [Grabowski] and I have had hundreds of discussions with Ms. Kaiser and her advisors regarding management of AKT and the franchise business. The notion that we "froze" Ms. Kaiser out of management of AKT is false. To be sure, there have been many instances in which Mr. Grobowski and I have not agreed with Ms. Kaiser and did not accept her suggestions, but that does not mean that we froze her out of management of the company.

174. Anna Kaiser was also a member of the Board of Managers of AKT in at least 2018, 2019, and 2020.

175. Save for disclosing Geisler as the CEO of AKT Franchisor in 2018, AKT Franchisor failed to disclose Geisler, Grabowski, and Anna Kaiser in its FDDs as required by the CFIL.

176. Similarly, AKT Franchisor failed to disclose in its FDDs other individuals with management responsibility relating to sales and operation of AKT franchises, including, among others, the following:

a. Freeman, the President of Franchise Development for Xponential, had substantive sales conversations with multiple Plaintiffs prior to their execution of the Agreements, which included discussions and representations regarding the number of expected members at Plaintiffs' studios, the time it would take to open, and *pro formas* relating to AKT studios.

b. LaCava was (and, upon information and belief, remains) Director of Franchise Development for Xponential and was responsible for sales of AKT franchises. Justin had conversations with several Plaintiffs, inducing them to enter into their respective Agreements.

c. Cooper was the Director of Development for AKT Franchise from May 2019 through July 2020.

d. Meloun was the Chief Financial Officer of Xponential and AKT since October 2018. Meloun was not identified in any AKT FDD until the 2020 FDD, wherein AKT Franchisor admits he was its Chief Financial Officer since October 2018.

e. Losco was the Vice President of Franchise Development for Xponential since May 2018 and for AKT Franchisor since January 2019.

177. AKT Franchisor's failure to disclose the above individuals is a violation of the FTC Franchise Rule and the CFIL.

178. As a result of AKT Franchisor's failure to disclose the above individuals, Plaintiffs were not aware of the roles and responsibilities of several key figures in the AKT franchise system, nor their respective employment histories.

179. Had AKT Franchisor properly disclosed the information required to be disclosed in Item 2 of their FDDs, Plaintiffs would not have executed the Agreements.

180. Defendants, and particularly AKT Franchisor and Geisler, are experienced in franchising.

181. In his own words, Geisler stated:

> I served as President of UFC Gym Franchise, following its acquisition of LA Boxing, a boutique fitness concept that I started with a single gym in 2003 and built to become the largest boxing, kickboxing, and mixed martial arts franchise, with 200 locations in 35 states.

182. Defendants knew what they were supposed to disclose in Item 2 of AKT Franchisor's FDDs.

183. Defendants knowingly and recklessly omitted the information required to be disclosed in Item 2.

184. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of the franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

185. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

186. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

## THIRD CAUSE OF ACTION

## VIOLATION OF CALIFORNIA FRANCHISE INVESTMENT LAW

## § 31200: FAILURE TO DISCLOSE LITIGATION AND MATERIAL TERMS OF SETTLEMENTS

***(Plaintiffs Against Defendants)***

187. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

188. The FTC Franchise Rule requires a franchisor to disclose in its FDD whether any individual who was listed or should have been listed in Item 2 of the FDD "[h]as pending against that person . . . [a] material civil action alleging fraud, unfair or deceptive trade practices, or comparable allegations" or "[h]as in the 10-year period immediately before the disclosure document's issuance date:

> Been held liable in a civil action involving an alleged violation of a franchise, antitrust, or securities law, or involving allegations of fraud, unfair or deceptive practices, or comparable allegations. ''Held liable'' means that, as a result of claims or counterclaims, the person must pay money or other consideration, must reduce an indebtedness by the amount of an award, cannot enforce its rights, or must take action adverse to its interests.

189. The FTC Rule (16 C.F.R. 436.5(c)(3)(ii) fn. 2) requires disclosure of "all material settlement terms" of a settlement required to be disclosed, whether or not the agreement is confidential.

***Geisler's Fraudulent Promises Lawsuit***

190. On April 8, 2009, Geisler was named as a defendant in a civil lawsuit in Orange County Superior Court (the "Fraudulent Promises Lawsuit") relating to the franchise brand Geisler started, LA Boxing.

191. The plaintiff in the Fraudulent Promises Lawsuit alleged that Geisler made fraudulent promises that the plaintiff would receive a base pay in addition to one percent of the gross revenue of every franchisee in the LA Boxing franchise system, that he would be given a franchise in the LA Boxing franchise system, and that he would receive an ownership interest in the franchisor entity.

192. The Fraudulent Promises Lawsuit complaint alleged that Geisler, at the time these promises were made, never intended to perform on the promises, but made them only to induce the plaintiff to remain as the Director of Sales of the LA Boxing franchise.

193. The Judicial Council of California Civil Jury Instructions ("CACI") for False Promise requires that a plaintiff prove that:

1) the defendant made a promise,
2) the defendant did not intend to perform the promise when made,
3) the defendant intended for the plaintiff to rely on the promise,
4) the plaintiff reasonably relied on the promise,
5) the defendant did not perform the promised act,
6) the plaintiff was harmed, and
7) the plaintiff's reliance on the defendant's promise was a substantial factor in causing the harm.

194. The Judicial Council of California Civil Jury Instructions ("CACI") for False Promise quotes the following from *Engalla v. Permanente Medical Group, Inc.*: "'Promissory fraud" is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.'"

195. On December 16, 2010, after trial in the Fraudulent Promises Lawsuit, the jury returned a verdict against Geisler, holding him liable for false promise and specifically finding that Geisler committed fraud in June 2007. Judgment on the jury verdict was entered against Geisler on April 4, 2011 for $97,465.16 plus costs ("Fraudulent Promises Judgment"). On this basis, Geisler was "held liable" pursuant to the FTC Rule and, therefore, the judgment should have been disclosed in each AKT FDD until at least April 4, 2021.

196. The Fraudulent Promises Lawsuit and judgment were not disclosed in the 2018 FDD, 2019, FDD, 2020 FDD, or any other AKT Franchisor FDD (nor, upon information and belief, any other FDD of any Xponential brand).

***Geisler's LA Boxing Lawsuit Involving Breach of Fiduciary Duty, Conversion, and Fraud***

197. On July 17, 2013, Geisler was named as a defendant in a civil lawsuit in Orange County Superior Court (the "LA Boxing Fraud Lawsuit") relating to the

LA Boxing brand Geisler began to franchise. Shaun Grove, LA Boxing's corporate attorney, and now the President of Club Pilates and Rumble, was the other individual defendant named in the lawsuit.

198. The plaintiff in the LA Boxing Fraud Lawsuit, one of the original founders of the LA Boxing concept, alleged that, after clashes with Geisler over his management style and the corporate structure of LA Boxing, Geisler agreed to buy out the plaintiff's interest in LA Boxing for $2,500,000, to be paid $10,000 per month.

199. The plaintiff in the LA Boxing Fraud Lawsuit alleged that Geisler negotiated the purchase price down to $580,000 in 2009, knowing of the plaintiff's financial woes, with agreed-to price increases tied to an increase in the value of LA Boxing. The plaintiff alleged Geisler made only sporadic payments.

200. The plaintiff alleged that three years later, in 2012, Geisler again convinced the plaintiff to a reduced payout of $300,000, with a promise that it would be paid in ten monthly $30,000 payments.

201. The plaintiff alleged that, when he asked Geisler why Geisler was offering the accelerated payment amounts, "Geisler looked [the plaintiff] in the eye and lied to him," saying that the accelerated payment schedule was just to "clean up payments" and get the plaintiff "off the books."

202. In reality, the plaintiff alleged, "at the time Geisler approached [the plaintiff], Geisler and [Shaun] Grove had inside knowledge of a pending sale of LA Boxing" to UFC Gym, the franchisor where Anthony would soon become President, and wanted to ensure the plaintiff did not receive the benefit of "potentially millions of dollars he would have otherwise been entitled to as a result of the sale of LA Boxing."

203. The Plaintiff in the LA Boxing Fraud Lawsuit filed claims against Geisler for breach of fiduciary duty, conversion, and fraud, as well as four other counts.

204. Each of the above claims allege "fraud, unfair or deceptive practices, or comparable allegations."

205. After more than a year of litigation, on December 12, 2014, the case was dismissed with prejudice on the stipulation of the parties.

206. The LA Boxing Fraud Lawsuit and terms of settlement were not disclosed in the 2018 FDD, 2019, FDD, 2020 FDD, or any other AKT Franchisor FDD (nor, upon information and belief, any other FDD of any Xponential brand).

***Stretch Lab Fraudulent Inducement Lawsuit***

207. On October 25, 2018, Geisler was named a Third-Party Defendant by the founders of the Stretch Lab brand (Saul Janson and Timothy Trost), another franchise brand acquired by Xponential, in which the founders pled a claim for

fraudulent inducement (the "Stretch Lab Fraud Lawsuit"; together with the Fraudulent Promises Lawsuit and LA Boxing Fraud Lawsuit, the "Fraud Lawsuits"). The complaint against Geisler was amended March 18, 2019, to add a count for Aiding and Abetting Intentional Interference with Prospective Economic Advantage.

208. On September 11, 2019, counsel on behalf of Geisler notified the court in the Stretch Lab Fraud Lawsuit that "the parties have executed a settlement agreement . . . ." $6.5 million was paid to resolve the Fraudulent Inducement Lawsuit, including the Fraudulent Inducement Lawsuit Amended Complaint against Geisler.

209. Notwithstanding that Geisler, the CEO of AKT, was "held liable," the Stretch Lab Fraud Lawsuit was not disclosed in any AKT Franchisor FDD.

210. AKT Franchisor's failure to disclose the Fraud Lawsuits in any AKT Franchisor FDD is a violation of CFIL § 31200.

211. Defendants knew what they were supposed to disclose in Item 2 of AKT Franchisor's FDDs.

212. Defendants knowingly and recklessly omitted the information required to be disclosed in Item 2.

213. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of the

franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

214. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

215. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

**FOURTH CAUSE OF ACTION**

**FRAUD IN THE INDUCEMENT: FAILURE TO DISCLOSE FRAUD LAWSUITS**

***(By Plaintiffs Against AKT Franchisor, AKT Franchisor SPV, Geisler, Chordock, Cooper, Cordova, Freeman, Junk, Moen, Luna, Johnston, Lacava, Tetsch, Tylicki, Wiles, Losco, Holobinko, Wehrkamp, Ferguson, Thompson, McAdams, Bonner, Svilich, Nolan, Brown, and Markovic)***

216. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

217. In selling franchises and area development rights to each of Plaintiffs at discovery day and in telephone calls with Plaintiffs prior to discovery day, Defendants painted a picture of Geisler as a squeaky clean, exalted expert in franchising. Geisler himself told more than one Plaintiff at discovery days: "we have never closed a studio," perpetuating this image.

218. Defendants knew that if Geisler's real past, and in particular if the Fraud Lawsuits and their outcomes, were disclosed to Plaintiffs, Plaintiffs would not have signed their respective Agreements.

219. Defendants knowingly concealed the Fraud Lawsuits from Plaintiffs, intending to induce Plaintiffs to sign their respective Agreements to purchase franchise and area development rights.

220. Plaintiffs justifiably relied on Defendants' false portrayal of Geisler and Defendants' concealment of the Fraud Lawsuits, particularly because Defendants had a legal obligation to disclose the Fraud Lawsuits in AKT Franchisor's FDDs. Had Defendants disclosed the Fraud Lawsuits, Plaintiffs would not have signed their respective Agreements.

221. As a result of Defendants' fraud, Plaintiffs signed their respective Agreements and have lost hundreds of thousands (for certain Plaintiffs, millions) of dollars into a failed franchise system.

222. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

## FIFTH CAUSE OF ACTION

## VIOLATION OF CFIL § 31200 AND § 32101: WILLFULLY UNTRUE STATEMENTS REGARDING FRANCHISEES' ESTIMATED INITIAL INVESTMENT AND TIME TO OPEN STUDIOS

***(By Plaintiffs Against Defendants)***

223. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

224. Section 31200 of the CFIL states:

> It is unlawful for any person willfully to make any untrue statement of a material fact in any application, notice or report filed with the commissioner under this law, or willfully to omit to state in any such application, notice, or report any material fact which is required to be stated therein, or fail to notify the commissioner of any material change as required by Section 31123.

225. Section 31201 of the CFIL states:

> It is unlawful for any person to offer or sell a franchise in this state by means of any written or oral communication not enumerated in Section 31200 which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

226. AKT Franchisor issued an FDD to each of Plaintiffs as follows:

a. AKT Franchisor issued the 2018 FDD to Detroit Franchisees on August 2, 2018, and Inman Park Franchisee on February 18, 2019. In the 2018 FDD, AKT Franchisor represented that the estimated initial investment to open and operate an AKT studio was $346,100 to $487,000.

b. AKT Franchisor issued the 2019 FDD to Ohio Franchisees on May 2, 2019, Inman Park Franchisee on May 2, 2019, and Chicago Franchisee

on September 5, 2019. In the 2019 FDD, AKT Franchisor represented that the estimated initial investment to open and operate an AKT studio was $356,600 to $497,500.

c. AKT Franchisor issued the 2020 FDD to Tampa Bay Franchisee on January 26, 2021. In the 2020 FDD, AKT Franchisor represented that the estimated initial investment to open and operate an AKT studio was $341,200 to $529,900.

d. AKT Franchisor issued the 2021 FDD to East Florida Franchisee on October 13, 2021. In the 2021 FDD, AKT Franchisor represented that the estimated initial investment to open and operate an AKT studio was $319,300 to $499,700.

227. AKT Franchisor and its sales representatives also represented to Plaintiffs, at discovery day and at phone calls prior to discovery day, that the high end of the represented investment range was for studios in large cities in New York and California, and that Plaintiffs' investment would not be at the high end of the represented range given their respective locations.

228. The representations made by AKT Franchisor orally and in Item 7 of its FDDs were materially false. The following Plaintiffs' initial investments grossly exceeded the range represented by AKT Franchisor:

a. The actual initial investment for Royal Oak Franchisee was roughly $730,017.06, exceeding the low end of the represented range by $383,917.06 and the high end of the represented range by $243,017.06.

b. The actual initial investment for Rochester Hills Franchisee was $670,693.66, exceeding the low end of the represented range by $324,593.66 and the high end of the represented range by $183,693.66.

c. The actual initial investment for Mason Franchisee was $748,604, exceeding the low end of the represented range by $416,104 and the high end of the represented range by $249,104.

d. The actual initial investment for Liberty Franchisee was $845,611, exceeding the low end of the represented range by $513,111 and the high end of the represented range by $346,111.

e. The actual initial investment for Inman Park Franchisee was $ $801,768, exceeding the low end of the represented range by $469,268 and the high end of the represented range by $302,268.

f. The actual initial investment for Chicago Franchisee was $645,819, exceeding the low end of the represented range by $313,319 and the high end of the represented range by $146,319.

g. The actual initial investment for Tampa Bay Franchisee was $575,968, exceeding the low end of the represented range by $234,768 and the high end of the represented range by $46,068.

h. The actual initial investment for East Florida Franchisee's three studio – two of which correlated with 2020 FDD Item 7 numbers and one which correlated with 2021 FDD Item 7 numbers) was $2,488,668, exceeding the collective low end of the represented range by $1,486,968 and the collective high end of the represented range by $929,168, or more than $300,000 per studio.

229. AKT Franchisor even failed to include whole categories of investment. For example, AKT Franchisor did not disclose AKT's structural engineering design and sound engineering requirements (standard requirements for an AKT studio).

230. The misrepresented initial investment ranges in AKT Franchisor's FDDs were made more pronounced because AKT Franchisor also represented that Plaintiffs could expect to have construction of their studios completed four to eight weeks after signing their franchise agreement and to have their grand opening twelve weeks after signing of the franchise agreement. In its FDDs, AKT Franchisor stated more conservatively that the typical time from signing to opening was 3-6 months.

231. AKT Franchisor made these representations to Plaintiffs knowing that they were untrue or, at the very least, knowing that it did not have a reasonable basis to so represent.

232. The actual time it took Plaintiffs to build out and open their respective studios was, in each case, substantially longer than represented. The time from signing to grand opening was:

| **Franchisee** | **Date of Signing Franchise Agreement (FA)** | **Date Open For Business** | **Time From Signing FA to Open for Business** | **Date Studio Closed** |
|---|---|---|---|---|
| *Royal Oak* | 9/15/2018 | 12/9/2019 | 451 days | 12/31/2022 |
| *Rochester Hills* | 9/15/2018 | 5/5/2022 | 1,329 days | 12/31/2022 |
| *Mason* | 6/7/2019 | 6/25/2020 | 385 days | 3/4/2023 |
| *Liberty* | 7/7/2020 | 5/20/2021 | 318 days | 3/4/2023 |
| *Chicago* | 12/31/2019 | 5/30/2022 | 882 days | 3/19/2023 |
| *Inman* | 5/22/2019 | 9/8/2020 | 476 days | 5/30/2022 |
| *Tampa* | 3/24/2021 | 4/7/2022 | 380 days | 3/20/2023 |
| *East Florida 1st Location* | 6/9/2020 | 9/13/2021 | 462 days | 10/16/2022 |
| *East Florida 2nd Location* | 2/5/2021 | 2/24/2022 | 385 days | 11/13/2022 |
| *East Florida 3rd Location* | 1/6/2022 | 7/6/2022 | 182 days | 11/13/2022 |

233. Xponential Inc. has acknowledged the falsity of its representation, conceding in FTC filings that the average time for an Xponential studio to open after signing of the franchise agreement was more than 12 months.

234. The additional time required for Plaintiffs to build out and open their studios caused them to incur additional initial investment costs.

235. The representations AKT Franchisor made about Plaintiffs' expected initial investment were false and AKT Franchisor knew they were false because, upon information and belief, AKT Franchisor merely copied the estimated figures from another franchise brand. AKT Franchisor had no reasonable basis to make the representations.

236. Defendants sold AKT franchises to Plaintiffs using the above false and misleading statements regarding the estimated initial investment.

237. Defendants' violation was knowing and willful.

238. Plaintiffs have been seriously damaged as a result of Defendants' violations of the CFIL in an amount to be proven at trial, and are entitled to rescission and damages, as well as attorney fees, under the CFIL.

239. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of the franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

240. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

241. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF CFIL § 31200: WILLFULLY UNTRUE STATEMENTS OF MATERIAL FACT AND MATERIAL OMISSIONS RELATING TO FINANCIAL PERFORMANCE REPRESENTATIONS IN FRANCHISE DISCLOSURE DOCUMENTS**

***(Plaintiffs Against Defendants)***

242. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

243. In the 2018 FDD, 2019 FDD, and 2020 FDD, AKT Franchisor franchised its dance fitness studios, which it described as "a fitness studio that offers and provides indoor AKT Classes/instruction and other related exercise classes under the 'AKT' marks."

244. While AKT Franchisor had no franchise studios at the time it issued the 2018 FDD or 2019 FDD (AKT represented in the 2020 FDD that it had three franchise locations which began operating in 2019), AKT represented in Item 19 of the 2018 FDD, 2019 FDD, and 2020 FDD that two "Studios" were operated by the founder of the AKT brand, Anna Kaiser (the "Anna Kaiser Studios"), using the AKT System.

245. AKT Franchisor included the Anna Kaiser Studios in Item 20 of the 2018 FDD, 2019 FDD, and 2020 FDD as company-owned outlets.

246. The Anna Kaiser Studios never operated under a franchise agreement.

247. The Anna Kaiser Studios operated materially different from franchised studios, including Plaintiffs' AKT studios, a fact that Geisler admitted under penalty of perjury, stating:

> [Anna] refused to execute franchise agreements for the [Anna Kaiser Studios] unless she received special treatment to exempt her franchises from rules or requirements applicable to other AKT franchises. For example, Ms. Kaiser insisted that her Studios be allowed to offer and sell unapproved goods and services relating to nutrition, cryotherapy, cosmetics, and other fields, that the Seller Studios not have to comply with local marketing requirements and other practices required for every AKT franchise, and that the Seller Studios not have to comply with certain physical configurations, facilities or specifications required of other AKT studios.

248. Geisler even acknowledged that the physical configuration of the Anna Kaiser Studios was different than that of the franchise studios AKT Franchisor was selling.

249. The Anna Kaiser Studios were part of a much larger operation than the franchise studios actually offered by AKT Franchisor, an operation that included pop-up locations, celebrity training, in-home training, and extensive publicity.

250. The Anna Kaiser Studios had also been operating for five years by the time AKT Franchisor issued its first FDD in 2018.

251. The Anna Kaiser Studios provided numerous services and products that Plaintiffs were not permitted to offer.

252. The Anna Kaiser Studios generated substantial revenue from private training occurring at the studio and other locations.

253. Franchisees were not permitted to offer private training and private training was never a part of the franchise model for nearly all franchisees.

254. Based on these substantial differences in operation, Plaintiffs' studios were even built out materially differently than the Anna Kaiser Studios.

255. Prior to registering and issuing each of the 2018 FDD, 2019 FDD, and 2020 FDD to Plaintiffs, Defendants knew that the Anna Kaiser Studios were not operated like the franchise studio that AKT Franchisor was offering.

256. Prior to registering and issuing each of the 2018 FDD, 2019 FDD, and 2020 FDD to Plaintiffs, Defendants knew Anna Kaiser was refusing to execute franchise agreements to operate the Anna Kaiser Studios as franchise studios.

257. Nevertheless, AKT Franchisor made financial performance representations in the 2018 FDD, 2019 FDD, and 2020 FDD based on the financial performance of the Anna Kaiser Studios. Specifically, in Item 19 of the 2018 FDD, AKT Franchisor provided what it represented as the "Average and Median Gross Revenue" generated by the Anna Kaiser Studios from April 1, 2017 to March 31, 2018: $1,345,070.77. AKT Franchisor also provided the gross revenue for each of the two studios, as well as cost of sales and certain operating expenses. AKT Franchisor represented that one of the Anna Kaiser Studios generated $530,803.73 in "Total Revenue Less Certain Operating Expenses" and the other generated $360,005.60.53

258. In the 2019 FDD, AKT Franchisor revised its Item 19 financial performance representation, but continued to make the representation based on the Anna Kaiser Studios, this time representing that the "Average and Median Gross Revenue of the Anna Kaiser Studios for 2018 was $1,213,998.

259. In the 2020 FDD, AKT Franchisor again disclosed the average gross revenue of the Anna Kaiser Studios, this time representing the average to be $1,079,401.

260. When AKT Franchisor ceased using the Anna Kaiser Studios as the basis for its financial performance representation, the represented numbers dropped to less than one third of the numbers represented prior to 2021.

261. Under the FTC Franchise Rule, AKT Franchisor must have had a reasonable basis for the financial performance representations it made in its 2018 FDD, 2019 FDD, and 2020 FDD.

262. The North American Securities Administrators Association ("NASAA") provides that financial performance representations in franchise disclosure documents "must be based on the sort of factual information upon which a prudent businessperson would rely in making an investment decision."

263. AKT Franchisor did not have a reasonable basis, given the qualitative and quantitative differences in the operation of the Anna Kaiser Studios and the studios it was offering to Plaintiffs, to make the financial performance representations it did.

264. AKT Franchisor's financial performance representations in the 2018 FDD, 2019 FDD, and 2020 FDD were materially false and misleading and, lacking a reasonable basis, were violative of the FTC Franchise Rule and in turn the CFIL.

265. Defendants' violation was knowing and willful.

266. Plaintiffs have been seriously damaged as a result of AKT Franchisor's violations of the CFIL in an amount to be proven at trial, and are entitled to rescission and damages, as well as attorney fees, under the CFIL.

267. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

268. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

269. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF CFIL § 31200 AND § 32101: WILLFULLY UNTRUE FINANCIAL PERFORMANCE REPRESENTATIONS AND FAILURE TO DISCLOSE FINANCIAL PERFORMANCE REPRESENTATIONS IN FRANCHISE DISCLOSURE DOCUMENTS

***(Plaintiffs Against Defendants)***

270. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

271. At discovery day and in phone calls leading up to discovery day of each of Plaintiffs, AKT Franchisor and its personnel represented to Plaintiffs that they would reach 100 members prior to opening a studio (referred to by AKT Franchisor as "pre-opening"), 200 members during "soft opening" (the period between opening of the studio and the grand opening event), and 300 members by their grand opening event.

272. AKT Franchisor and its personnel also represented to Plaintiffs the monthly membership fees Plaintiffs would be charging members based on their studio "tier."

273. The above representations are, together, "financial performance representations," as that term is used in the FTC Franchise Rule. The combination of these two representations permitted Plaintiffs to readily calculate the monthly gross revenues they would expect, which enabled them to complete partially filled *pro formas* provided by AKT Franchisor and to develop their franchise sales projections.

274. Having already represented that Plaintiffs could expect to open their studios twelve weeks after signing their respective Franchise Agreements, Defendants effectively represented to Plaintiffs not only the expected gross revenue, but also

that this expected gross revenue would be achieved within a month of opening their respective studios.

275. AKT Franchisor did not include these financial performance representations in any FDD disclosed to Plaintiffs, in violation of the FTC Franchise Rule and CFIL Section 31200.

276. Plaintiffs did not achieve the membership levels represented by AKT Franchisor.

277. In fact, the very design of the studios dictated by AKT Franchisor was too small to ever accommodate the number of members in a class that would be required to make AKT Franchisor's representations true. While AKT Franchisor provided in its calculations and drawings for 30 members in regular classes and 25 members in band classes, only 20 to 22 members could fit in the studio room for regular classes and only 16 in band classes.

278. Upon information and belief, no other franchisee in the AKT franchise system nor any AKT studio operated by AKT Franchisor achieved those levels.

279. AKT Franchisor had no reasonable basis to make the financial performance representations and they were, when made, false – a violation of the CFIL.

280. Defendants' violation was knowing and willful.

281. Plaintiffs reasonably relied on AKT Franchisor's representations and were induced by them to enter into the Agreements.

282. Due to the falsity of the representations and AKT Franchisor's failure to disclose them in the respective franchise disclosure documents, Plaintiffs' financial projections were never achieved. Instead, Plaintiffs lost thousands and tens of thousands of dollars each month operating their studios at a loss until they were finally forced to close.

283. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

284. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

285. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF CFIL § 31200: FAILURE TO DISCLOSE USE OF A PUBLIC FIGURE IN FRANCHISE DISCLOSURE DOCUMENTS

***(Plaintiffs Against Defendants)***

286. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

287. Anna Kaiser is a well-known celebrity trainer "[w]ith clients like Kelly Ripa, Shakira, [and] Sarah Jessica Parker." Anna Kaiser has been featured in Vogue,

The NYTimes, Cosmopolitan, US Weekly, The Today Show, Good Morning America, SELF, Glamour, Shape, WWD, E!, InStyle, W Magazine, Women's Health, Well&Good, and has been a contributing editor for People Magazine. Anna Kaiser co-hosted the primetime ABC Series "My Diet is Better than Yours" and partnered with Target to create the C9 Limited Edition by Anna Kaiser, available in stores nationwide. NBC's "Know Your Value" deemed her the "reigning queen of fitness" and she was selected as one of Greatist's 100 Most Influential People in Health and Fitness.

288. Anna Kaiser is a public figure for purposes of Item 18 of the FTC Rule.

289. Under the FTC Franchise Rule, AKT Franchisor was required to disclose in Item 18 of its franchise disclosure documents the following:

a. Any compensation or other benefit given or promised to Anna Kaiser arising from either the use of Anna Kaiser in the franchise name or symbol, or Anna Kaiser's endorsement or recommendation of the franchise to prospective franchisees.

b. The extent to which Anna Kaiser is involved in the management or control of the franchisor. Describe Anna Kaiser's position and duties in the franchisor's business structure.

c. Anna Kaiser's total investment in the franchisor, including the amount Anna Kaiser contributed in services performed or to be performed.

State the type of investment (for example, common stock, promissory note).

290. AKT Franchisor never disclosed the information about Anna Kaiser in Item 18 of its FDD, including Anna's role as a member of the Board of Managers of AKT Franchisor, the services she performed or promised to perform under her consulting agreement, and other aspects of her relationship and involvement with AKT Franchisor and the AKT brand.

291. AKT Franchisor's failures are violations of CFIL § 31200 and § 31201.

292. Defendants' violation was knowing and willful.

293. Had the information required to be disclosed actually been disclosed, including the true nature of AKT Franchisor's relationship with Anna Kaiser, Plaintiffs would not have executed their respective Agreements.

294. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

295. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

296. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

**NINTH CAUSE OF ACTION**

**VIOLATION OF CFIL § 31200 AND § 32101: FAILURE TO DISCLOSE CHANGES OF CONTROL AND PUBLIC OFFERING OF SECURITIES IN FRANCHISE DISCLOSURE DOCUMENTS**

***(Mason Franchisee, Chicago Franchisee, Tampa Franchisee, and East Florida Franchisee Against Defendants)***

297. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

298. In the 2018 FDD, AKT reported that Xponential was its parent company, and that Xponential was owned by H&W Franchise Holdings, LLC ("H&W").

299. On June 28, 2018, a change of control in H&W, and thus AKT, occurred.

300. The change of control was a material change in AKT Franchisor's hierarchy.

301. The change of control was not reflected in Item 1 of any AKT FDD following its occurrence.

302. On February 13, 2020, Xponential Inc. filed a draft Form S-1 Registration Statement with the SEC, disclosing its intentions to become a publicly traded company.

303. No reference of Xponential Inc.'s plans to become a publicly traded company was made in the 2020 FDD or 2021 FDD. Only in the 2022 FDD, registered in California on April 1, 2022, did AKT first mention that Xponential Inc. was publicly traded.

304. The decisions to permit a change of control of AKT Franchisor's parent company and to cause the controlling entity of AKT Franchisor to become

publicly traded are material and should have resulted in amendments to AKT Franchisor's franchise disclosure documents.

305. AKT Franchisor did not seasonally amend its franchise disclosure documents to disclose this material information– a violation of CFIL § 31200 and § 31123.

306. Defendants' violation was knowing and willful.

307. AKT Franchisor's failure to disclose its changes in control and impending public offering resulted in Mason Franchisee, Chicago Franchisee, Tampa Franchisee, and East Florida Franchisee executing Agreements with AKT Franchisor that they otherwise would not have executed. They are entitled to rescind these Agreements and to be placed in the position they would have been in had they not executed these Agreements. In the alternative, they are entitled to damages resulting from Defendants' failure to timely disclose changes its changes in control and public offering.

308. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

309. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

310. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

## TENTH CAUSE OF ACTION

## VIOLATION OF CFIL § 31200: FAILURE TO DISCLOSE BANKRUPTCY IN FRANCHISE DISCLOSURE DOCUMENTS

***(East Florida Franchisee, Paul, Jodi, Tampa Franchisee, Nichole, Michael, Chicago Franchisee, and Nisha Against Defendants)***

311. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

312. The CFIL, through the FTC Franchise Rule, requires AKT Franchisor to disclose in its franchise disclosure documents whether anyone with management responsibility relating to sales or operation of AKT franchises had, in the past ten years, filed a petition for bankruptcy or obtained a discharge of debts in bankruptcy.

313. Losco was the Vice President of Franchise Development for Xponential since May 2018 and for AKT since January 2019.

314. Losco filed a voluntary petition for individual bankruptcy in the Central District of California on May 5, 2019.

315. Losco obtained a discharge of his debts (including, apparently, debts related to operation of UFC fitness franchises, the brand for which Geisler was formerly President) under the Bankruptcy Code on August 26, 2019.

316. AKT Franchisor willfully failed to disclose this bankruptcy in any franchise disclosure document in violation of the CFIL.

317. Plaintiffs relied on AKT Franchisor's representation that no director, officer, or manager had filed for bankruptcy in the preceding ten years in executing their respective Agreements. Had AKT Franchisor properly disclosed Losco's bankruptcy, Plaintiffs would not have entered into the Agreements.

318. Pursuant to CFIL § 31302, each of the Defendants, either a person directly or indirectly controlling AKT Franchisor or materially aiding in the sale of the franchises under AKT Franchisor's defective FDDs, is jointly and severally liable for the CFIL violations described above.

319. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

320. Plaintiffs are entitled to attorney fees and costs incurred as a result of Defendants' violations.

## ELEVENTH CAUSE OF ACTION

## BREACH OF CONTRACT AND CONVENANT OF GOOD FAITH AND FAIR DEALING: UNDERCUTTING MEMBERSHIP SALES

***(Franchisees Against AKT Franchisor and AKT Franchisor SPV)***

321. Franchisees incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

322. In the Franchise Agreements, AKT Franchisor granted to Franchisees the right to operate an AKT franchise at an authorized location and agreed that

neither it nor its affiliates would operate or establish another AKT studio within the Franchisees' respective territories.

323. While Franchisees were operating studios in their respective territories, Xponential and AKT Franchisor announced Xpass, a program allowing prospective members of Plaintiffs' AKT studios to purchase an X-Pass subscription or package directly from Xponential, which permitted the members to access classes at all Xponential brands, including at Plaintiffs' studios.

324. Instead of prospective members having to agree to a monthly or annual membership or a class pack with Plaintiffs, they could instead purchase an XPass subscription from Xponential, often at discounts of up to 50%, and have the same access to Plaintiffs' studios and classes.

325. Instead of receiving a monthly membership fee from members, Plaintiffs received only a per-class payment from Xponential, typically only a few dollars.

326. Xponential's Xpass directly competed against Plaintiffs' AKT studios.

327. Xponential advertised its XPass broadly, even in zip codes where Plaintiffs' studios were located.

328. After the launch of XPass, sales of monthly memberships and class packs became increasingly difficult for Plaintiffs, who were now left to try to convince the same prospective members targeted by Xponential for its XPass that they should instead sign up for a membership limited only to the AKT studio.

329. Not only did XPass directly compete for members and member dollars with Plaintiffs, but XPass also deflated Plaintiffs' already-struggling financial model even more. Plaintiffs were effectively subsidizing XPass for Xponential.

330. The introduction of Xpass by AKT Franchisor and Xponential is an explicit breach of the Franchise Agreements and a breach of their covenants of good faith and fair dealing.

331. Plaintiffs were damaged by the breach of the franchise agreements, having lost members and revenue dollars in an amount to be determined at trial.

332. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the breaches of the Franchise Agreements.

333. Xponential is similarly liable for breaches of the Franchise Agreements because, as an affiliate of AKT Franchisor, its conduct is prohibited by the Franchise Agreements.

## TWELFTH CAUSE OF ACTION

## VIOLATION OF MICHIGAN FRANCHISE INVESTMENT LAW (MCL 445.1508): SALE OF FRANCHISE WITHOUT PROVIDING FRANCHISE DISCLOSURE DOCUMENT

***(Dance Fitness Michigan, LLC and Deanna Against AKT Franchisor, AKT Franchisor SPV, Xponential, Xpo Holdings, Xpo Inc., Geisler, Chordock, Grabowski, Moen, Losco, Johnston, Tylicki, Thompson, Wiles, and McAdams)***

334. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

335. Section 8 of the Michigan Franchise Investment Law ("MFIL") requires a franchisor to provide a prospective franchisee with a current copy of the franchisor's franchise disclosure document at least ten business days prior to execution of any binding franchise agreement.

336. On or about June 26, 2019, AKT Franchisor provided a franchise agreement to Deanna to sign on behalf of herself and Dance Fitness Michigan, LLC for operation of an AKT franchise studio in Rochester Hills, Michigan.

337. Prior to executing the franchise agreement for Rochester Hills and obtaining Deanna and Dance Fitness Michigan, LLC's signatures for the same, AKT Franchisor failed to provide a franchise disclosure document to Deanna or Dance Fitness Michigan, LLC, as required by the MFIL.

338. Deanna and Dance Fitness Michigan, LLC are entitled to damages and rescission under the MFIL, plus attorney fees and costs as provided by the MFIL.

339. Defendants AKT Franchisor SPV, Xponential, Xpo Holdings, Xpo Inc., Geisler, Chordock, Grabowski, Moen, Losco, Johnston, Tylicki, Thompson, Wiles, and McAdams are jointly and severally liable under the MFIL as persons who directly or indirectly control AKT Franchisor and/or are directors, managers, principal executive officers, or persons who materially aided in the MFIL violation.

## THIRTEENTH CAUSE OF ACTION

## FRAUDULENT MISREPRESENTATION

***(Paul, Jodi, and East Florida Franchisee Against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich)***

340. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

341. On December 6, 2021, Chordock, Junk, Johnston, and Svilich approached Paul and Jodi at AKT Franchisor's annual convention (who were attending their first annual conference as franchisees in the Xponential system), soliciting Paul to take over the AKT studio in Miami that had closed during the convention.

342. Chordock, Junk, Johnston, and Svilich (all acting individually and on behalf of AKT Franchisor) told Paul and Jodi that the Miami studio had closed abruptly, but that it would be successful when reopened by Paul and Jodi.

343. Chordock, Junk, Johnston, and Svilich told Paul and Jodi that they would do whatever was necessary to help them succeed in re-opening Miami, stating they were the "perfect operators" for the "premier" Miami studio.

344. Chordock, Junk, Johnston, and Svilich knew that the former franchisees of the AKT Miami studio were in arbitration with AKT Franchisor and in litigation in Orange County, California Superior Court with Chordock, Johnston, Geisler, and several other individuals associated with Xponential Inc. and AKT Franchisor.

345. Even though Chordock and Johnston were named personally as defendants in the lawsuit, Chordock, Junk, Johnston, and Svilich intentionally concealed this information from Paul, Jodi, and East Florida Franchisee.

346. Specifically, Chordock, Junk, Johnston, and Svilich did not disclose that the former Miami franchisee sued Chordock and Johnston (and were presently in the middle of the lawsuit) for misrepresentations about the cost to open the AKT Miami studio and the number of members the studio would achieve – the same sorts of representations that Chordock and Johnston made to Paul, Jodi, and East Florida Franchisee about the AKT Miami studio.

347. Chordock, Junk, Johnston, and Svilich stated that the AKT Miami studio had more than 150 members when it closed and that this member based remained largely intact – that most of these members would return quickly to the studio if Paul and Jodi reopened it.

348. Chordock, Junk, Johnston, and Svilich did not disclose why the Miami AKT studio closed.

349. Paul, Jodi, and East Florida Franchisee were induced to agree to reopen the Miami AKT studio based on the representations of Chordock, Junk, Johnston, and Svilich.

350. Paul, Jodi, and East Florida Franchisee reasonably relied on the representations regarding the membership base at the Miami studio in agreeing to reopen the studio and in executing a lease at the studio location.

351. Chordock, Junk, Johnston, and Svilich knew at the time they made the representations about the Miami studio members that they were false. In reality, AKT Franchisor had "frozen" the members' membership charges and automatically began to charge them fees when Paul, Jodi, and East Florida Franchisee reopened the studio.

352. Contrary to the representations of Chordock, Junk, Johnston, and Svilich, most of the members demanded refunds and threatened legal action against Paul, Jodi, and East Florida Franchisee, asserting they were being charged for memberships without their consent. Paul and Jodi discovered that nearly half of the studio's former members were sent to collections by AKT Franchisor and Club Ready for monthly fees of $15 that AKT Franchisor continued to charge these members after the AKT Miami studio originally closed.

353. Defendants left Paul, Jodi, and East Florida Franchisee to manage the ensuing fallout, with one member spitting into Jodi's face and saying they were "thieves" who should "burn in hell," a far cry from the eager members Defendants represented were awaiting Paul and Jodi at the AKT Miami studio.

354. Paul, Jodi, and East Florida Franchisee were damaged as a result of Defendants' fraudulent misrepresentation, having committed to signing a lease as well as infusing significant capital (more than $225,000) and time into the Miami studio at a time when they were attempting to also keep operating three additional studios.

355. The loss of funds and time ultimately caused Paul, Jodi, and East Florida Franchisee to close not only the Miami studio after scarcely eight months, but their remaining three studios in Southeast Florida as well, resulting in losses of more than $2 million.

356. As a result of the misrepresentations, Paul and Jodi were forced to file for bankruptcy.

357. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

358. Paul, Jodi, and East Florida Franchisee are entitled to attorney fees and costs pursuant to the parties' other contracts.

## FOURTEENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

***(Paul, Jodi, and East Florida Franchisee Against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich)***

359. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

360. Chordock, Junk, Johnston, and Svilich made the misrepresentations identified in the immediately preceding count without reasonable grounds for believing them to be true and with the intent to induce Paul, Jodi, and East Florida Franchisee to reopen the Miami AKT studio.

361. Paul, Jodi, and East Florida Franchisee justifiably relied on these misrepresentations to their detriment, suffering losses of more than $2 million and being forced into bankruptcy.

362. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

363. Paul, Jodi, and East Florida Franchisee are entitled to attorney fees and costs pursuant to the parties' other contracts.

**FIFTEENTH CAUSE OF ACTION**

**VIOLATION OF THE FLORIDA FRANCHISE ACT: INTENTIONAL MISREPRESENTATIONS REGARDING THE PROSPECTS OR CHANCES FOR SUCCESS OF A PROPOSED OR EXISTING FRANCHISE AND INTENTIONAL MISREPRESENTATION AND OMISSION OF THE KNOWN REQUIRED TOTAL INVESTMENT FOR THE MIAMI FRANCHISE**

***(Paul, Jodi, and East Florida Franchisee Against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich)***

364. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

365. Section 2 of the Florida Franchise Act ("FFA") (Fl. Stat. § 817.416 *et seq.*) prohibits, in the sale of a franchise, the intentional misrepresentation of "the prospects or chances for success of a proposed or existing franchise" and the intentional misrepresentation or failure to disclose "the known required total investment for such franchise."

366. AKT Franchisor, Chordock, Junk, Johnston, and Svilich made the misrepresentations identified in Count XIII (Fraudulent Misrepresentation) without reasonable grounds for believing them to be true and with the intent to induce Paul, Jodi, and East Florida Franchisee to reopen the Miami AKT studio.

367. AKT Franchisor, Chordock, Junk, Johnston, and Svilich all represented that the AKT Miami studio would be immediately successful when reopened because it had a large and loyal member base ready to engage.

368. AKT Franchisor, Chordock, Junk, Johnston, and Svilich represented that the AKT Miami studio was a no-brainer and would require minimal investment.

369. AKT Franchisor, Chordock, Junk, Johnston, and Svilich knew that the AKT Miami studio would require extensive investment despite the fact that the buildout was complete, and knew that the required total investment would cost several hundred thousand dollars, including large investments in marketing and advertising to build a member base that they knew was unlikely to return.

370. AKT Franchisor, Chordock, Junk, Johnston, and Svilich knew that that the former Miami franchisees were presently suing AKT Franchisor, Chordock, Johnston, Geisler, and several other individuals associated with AKT Franchisor and Xponential, asserting that the AKT Miami studio could not succeed because the number of members AKT Franchisor personnel represented would be achieved was not achieved.

371. AKT Franchisor, Chordock, Junk, Johnston, and Svilich did not disclose these facts to Paul, Jodi, or East Florida Franchisee.

372. The intentional misrepresentations by AKT Franchisor, Chordock, Junk, Johnston, and Svilich of the prospects of success of the AKT Miami studio and the misrepresentations about the total investment that would be required for the studio are violations of the FFA.

373. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

374. Pursuant to the FFA, Paul, Jodi, and East Florida Franchisee are entitled to damages, as well as attorney fees and costs, in an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION

## BREACH OF CONTRACT

***(Paul, Jodi, and East Florida Franchisee Against AKT Franchisor and AKT Franchisor SPV)***

375. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

376. AKT Franchisor and the individuals above promised to help Paul, Jodi, and East Florida Franchisee secure $250,000, with $150,000 coming from an equipment lease back and another $100,000 coming from bridge financing from Xponential Inc.'s initial public offering.

377. Based on these promises, Paul, Jodi, and East Florida Franchisee were convinced to reopen the Miami franchise location and agreed to do so.

378. Relying on AKT Franchisor's promised assistance, Paul and Jodi, executed a lease for the premises at which the former Miami AKT studio operated and began paying rent.

379. Less than two weeks later, AKT Franchisor informed Paul, Jodi, and East Florida Franchisee that it was reneging on providing the $100,000 promised bridge loan.

380. Less than two weeks after making its agreement with Paul and Jodi, AKT Franchisor notified Paul and Jodi that they "don't do [the equipment leases] anymore."

381. Nevertheless, having breached its agreement, AKT Franchisor, through Chordock and others, placed constant, heavy pressure on Paul and Jodi to reopen the Miami studio as soon as possible and telling them to focus on Miami instead of their Coral Springs location.

382. At all times, Paul, Jodi, and East Florida Franchisee performed under their agreement to reopen the Miami AKT studio, re-opening the studio in an impressive seven weeks.

383. AKT Franchisor's breach of agreement damaged Paul, Jodi, and East Florida Franchisee in an amount to be determined at trial.

384. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

385. Paul, Jodi, and East Florida Franchisee are entitled to attorney fees and costs pursuant to the parties' other contracts.

**SEVENTEENTH CAUSE OF ACTION**

**PROMISSORY ESTOPPEL**

***(East Florida Franchisee, Paul, and Jodi Against AKT Franchisor and AKT Franchisor SPV)***

386. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

387. AKT Franchisor promised Paul, Jodi, and East Florida Franchisee that they would secure $250,000 for the operation of the AKT Miami studio, with $150,000 coming from an equipment lease back and another $100,000 coming from bridge financing from Xponential Inc.'s initial public offering.

388. AKT Franchisor intended to thereby induce Paul, Jodi, and East Florida Franchisee to reopen the AKT Miami studio.

389. Paul, Jodi, and East Florida Franchisee were induced to act to their detriment, signing a lease for the location of the AKT Miami studio, investing substantial time and money into its reopening and operation, and ultimately being forced to close all three of their other AKT studios and seek bankruptcy protection.

390. Injustice can only be avoided by enforcing the promise and compensating Paul, Jodi, and East Florida franchisee for the damages caused by AKT Franchisor reneging on its promises.

391. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

## EIGHTEENTH CAUSE OF ACTION

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT: FAILURE TO PROVIDE FDD IN OFFER AND SALE OF FRANCHISE

***(East Florida Franchisee, Paul, and Jodi Against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich)***

392. Plaintiffs incorporate the allegations contained in the preceding paragraphs as if fully restated herein.

393. At the AKT convention in December 2021, AKT Franchisor, Chordock, Junk, Johnston, and Svilich offered and sold an AKT franchise (the old Miami franchise studio) to East Florida Franchisee, Paul, and Jodi.

394. Prior to the sale of the Miami franchise, AKT Franchisor never provided a franchise disclosure document to East Florida Franchisee, Paul, or Jodi.

395. Failure to provide a franchise disclosure document that complies with the FTC Franchise Rule is an unfair and deceptive trade practice under Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)) (“FTCA”).

396. An unfair and deceptive trade practice under the FTCA is a deceptive or unfair practice under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

397. AKT Franchisor's failure to provide a franchise disclosure document that complies with the FTC Franchise Rule caused Paul, Jodi, and East Florida Franchisee to agree to reopen the AKT Miami studio, commit to a lease at the studio location, and invest significant money and time into the studio.

398. Paul, Jodi, and East Florida Franchisee were damaged as a result of AKT Franchisor's failure, losing more than two million dollars and, ultimately, having to close their three additional studios and file for bankruptcy.

399. Chordock, Junk, Johnston, and Svilich each actively and directly participated in the selling of the AKT Miami franchise without issuing a franchise disclosure document, when each knew they were required to provide the document prior to selling the franchise. They are therefore liable under the FDUTPA.

400. AKT Franchisor SPV, a mere continuation of AKT Franchisor, is liable for the actions of AKT Franchisor.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS REQUEST that this Court enter an award in favor of Plaintiffs and against Defendants as follows:

A. As to the **First Cause of Action**:

i. Enter a declaratory judgment ruling that the Arbitration Provisions contained in the Agreements are unenforceable, and temporarily, preliminarily, and permanently enjoining Defendants from filing any arbitration demand against Plaintiffs and permanently staying the Arbitration Proceedings (Case No.'s 01-23-0001-9565, 01-23-0001-2023; 01-23-0001-2030, 01-23-0001-2033, 01-23-0001-2034);

ii. Award Plaintiffs their attorney fees and costs in bringing this action to enjoin enforcement of the unenforceable Arbitration Provisions; and

iii. Award such other relief as the Court deems just and proper.

B. As to the **Second Cause of Action**, **Third Cause of Action**, **Fifth Cause of Action**, **Sixth Cause of Action**, **Seventh Cause of Action**, **Eight Cause of Action**, and **Ninth Cause of Action**:

i. Order the Agreements rescinded and all provisions therein void and unenforceable;

ii. Award rescission, actual, expectation, consequential, punitive, and/or reliance damages to Plaintiffs in an amount to be proven at trial;

iii. Award attorney fees, costs, interest, and other amounts provided for by the CFIL and common law; and

iv. Award any such additional relief this Court deems just and proper.

C. As to the **Fourth Cause of Action**:

i. Order the Agreements rescinded and all provisions therein void and unenforceable;

ii. Award rescission, expectation, consequential, and/or punitive damages to Plaintiffs and against AKT Franchisor, AKT Franchisor SPV, Geisler, Chordock, Cooper, Cordova, Freeman, Junk, Moen, Luna, Johnston, Lacava, Tetsch, Tylicki, Wiles, Losco, Holobinko, Wehrkamp, Ferguson, Thompson, McAdams, Bonner, Svilich, Nolan, Brown, and Markovic in an amount to be proven at trial;

iii. Award attorney fees, costs, interest, and other amounts provided for by statute and common law; and

iv. Award any such additional relief the Court deems just and proper.

D. As to the **Tenth Cause of Action**:

i. Order the Agreements of Plaintiffs East Florida Franchisee, Paul, Jodi, Tampa Franchisee, Nichole, Michael, Chicago Franchisee, and Nisha rescinded and all provisions therein void and unenforceable;

ii. Award rescission, actual, expectation, consequential, punitive, and/or reliance damages to East Florida Franchisee, Paul, Jodi, Tampa Franchisee, Nichole, Michael, Chicago Franchisee, and Nisha in an amount to be proven at trial;

iii. Award attorney fees, costs, interest, and other amounts provided for by the CFIL and common law; and

iv. Award any such additional relief this Court deems just and proper.

E. As to the **Eleventh Cause of Action**:

i. Award rescission, expectation, consequential, and/or punitive damages to Franchisees in an amount to be proven at trial;

ii. Award attorney fees, costs, interest, and other amounts provided for by the Franchise Agreement; and

iii. Award any such additional relief the Court deems just and proper.

F. As to the **Twelfth Cause of Action**:

a. Award rescission, actual, expectation, consequential, punitive, and/or reliance damages to Deanna and Dance Fitness Michigan, LLC and against AKT Franchisor, AKT Franchisor SPV, Xponential, Xpo Holdings, Xpo Inc., Geisler, Chordock, Grabowski, Moen, Losco, Johnston, Tylicki, Thompson, Wiles, and McAdams in an amount to be proven at trial;

b. Award attorney fees, costs, interest, and other amounts provided for by statute and common law; and

c. Award any such additional relief the Court deems just and proper.

G. As to the **Thirteenth Cause of Action** and **Fourteenth Cause of Action**:

i. Award actual, consequential, and/or punitive damages to East Florida Franchisee, Paul, Jodi and against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich in an amount to be proven at trial;

ii. Award attorney fees, costs, interest, and other amounts provided for by statute and common law; and

iii. Award any such additional relief the Court deems just and proper.

H. As to the **Fifteenth Cause of Action**:

i. Award rescission, actual, expectation, consequential, punitive, and/or reliance damages to Plaintiffs in an amount to be proven at trial;

ii. Award attorney fees, costs, interest, and other amounts provided for by the FFA and common law; and

iii. Award any such additional relief the Court deems just and proper.

I. As to the **Sixteenth Cause of Action** and **Seventeenth Cause of Action**:

i. Award rescission, expectation, consequential, and/or punitive damages to East Florida Franchisee, Paul, and Jodi and against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich in an amount to be proven at trial;

ii. Award attorney fees, costs, interest, and other amounts provided for by agreement and applicable law; and

iii. Award any such additional relief the Court deems just and proper.

J. As to the **Eighteenth Cause of Action**:

i. Order that any agreement associated with the AKT Miami studio between East Florida Franchisee, Paul, and Jodi, and AKT Franchisor, rescinded and all provisions therein void and unenforceable;

ii. Award rescission, actual, expectation, consequential, punitive, and/or reliance damages to East Florida Franchisee, Paul, and Jodi and against AKT Franchisor, AKT Franchisor SPV, Chordock, Junk, Johnston, and Svilich in an amount to be proven at trial;

iii. Award attorney fees, costs, interest, and other amounts provided for by the FDUTPA and common law; and

iv. Award any such additional relief the Court deems just and proper.

Dated: October 9, 2023

**TRIO LAW PLC**

By: /s/ Briar Siljander

Briar Siljander (SBN 338293)
TRIO LAW PLC
376 Beach Farm Cir. #1269
Highland, MI 48356
(248) 529-6730
briar@triolawplc.com
Attorneys for Plaintiffs